IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SIPEX CORPORATION<br>SECURITIES LITIGATION<br><br>AND CONSOLIDATED CASES | No. C 05-00392 WHA<br><br>**ORDER APPOINTING LEAD<br>PLAINTIFFS GLOBIS CAPITAL<br>PARTNERS LP AND SHAYE<br>HIRSCH** |

**INTRODUCTION**

Pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104–67, 109 Stat. 737 (codified as additions and amendments to 15 U.S.C. 77–78 and 18 U.S.C. 1964), this order appoints Globis Capital Partners LP and Shaye Hirsch as the lead plaintiffs for two cases previously consolidated as the above-named action. The consolidated actions involve securities fraud. This order sets forth the criteria for selection and approval of lead plaintiff and also sets forth the procedure that will be used for the selection and approval of class counsel.

**FACTS**

These consolidated class actions arise from the alleged financial misrepresentation by Sipex Corporation. Sipex designs, manufactures and markets semiconductors that are used by original equipment manufacturers in the computing, consumer electronics, communications and networking infrastructure markets (Jacobson Compl. ¶ 2). During the alleged class period, Sipex reported positive results in its SEC filings (*id.* ¶ 3).[1] In publically disseminated press

---

[1] The alleged class period is April 10, 2003, through and including January 20, 2005.

releases, the company attributed the results to increased semiconductor sales and cost savings resulting from restructuring its operations (*ibid*). On January 20, 2005, after the market closed, Sipex issued a press release announcing that it might need to restate its reported financial statements for fiscal year 2003 and for the first three quarters of fiscal year 2004 due to possible "improper recognition of revenue" and that the company's audit committee and board of directors had commenced an internal investigation of the matter (*id.* ¶ 4). As a result of the investigation, Sipex stated that it would not be able to file its 2004 annual report with the SEC on time (*ibid.*). In reaction to this news, the price of Sipex common stock dropped 23% from its previous trading day's closing price (*ibid*).

Four class actions were filed.[2] Plaintiffs named Sipex corporation and its officers, Douglas M. McBurnie, Walid Maghribi, Phillip Kagel and Clyde Ray Wallin as defendants. The complaints alleged that defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule10b-5, promulgated thereunder, by making allegedly false and misleading statements, causing plaintiffs to purchase Sipex securities at artificially inflated prices.

Initially, there were several competing movants for the position of lead plaintiff: Walter Bednarszyk and James T. Collier, Roy and Margaret Gentles, the "Young Group" that included six individuals and the "Globis Group" that included Globis Capital Partner LP and Shaye Hirsch. Before the hearing on the appointment of lead plaintiff, the Court requested each lead plaintiff to complete a questionnaire. The Court's questionnaire alerted movants that it would evaluate the qualifications of single investors, not groups, as lead plaintiffs. The Court's questions focused on the qualifications of the lead plaintiff, their experience in managing litigation, potential conflicts and transactions related to the instant securities case. The Court received back two questionnaires, one from Paul Packer, on behalf of Globis Capital Partners

---

[2] Initially the following five related actions were filed: *Barbara Keller v. Sipex*, C05-00331 WHA, *Coil Partners, LLC v. Sipex*, C05-00392 WHA, *Levy v. Sipex*, C05-00505 WHA and *Alfred H. Jacobson v. Sipex*, C05-00712 WHA. Eventually, all the actions voluntarily dismissed except for *Coil Partners, LLC v. Sipex* and *Alfred H. Jacobson v. Sipex*. They were consolidated into this action.

1   LP, and one from Shaye Hirsch.  None of the other movants returned questionnaires.
2   Subsequently, the Gentiles moved for withdrawal of appointment as lead plaintiff.
3       The Court held a hearing on the appointment of lead plaintiff on May 12, 2005.  The
4   only candidates present were Mr. Packer, on behalf of Globis, and Mr. Hirsch.  The Court
5   questioned both plaintiffs on their qualifications, experience and financial loss.
6       Mr. Packer is the managing member of Globis Capital Partners LP, a hedge fund that
7   deals with small and mid-cap-value companies.  He has previous experience as a lead-plaintiff.
8   Before the alleged class period he held 520,570 shares of Sipex stock.  During the alleged class
9   period he purchased 1,110,086 shares of stock and sold 1,201,229 shares of stock.  Despite
10  being a net seller during the alleged class period, Globis' alleged estimated loss is $725,857, a
11  point discussed below.  Mr. Hirsch is an individual investor.  During the alleged class period he
12  bought $7,000 shares.  He estimates his total loss to be between $20,000 and $25,000.  Globis
13  and Mr. Hirsch asked the Court to appoint them as joint lead-plaintiffs.  Mr. Packer and Mr.
14  Hirsch are friends and their families have known each other for many years.  Each had seen the
15  published notice of the class action and had contacted the law firm of Bernstein Liebhard &
16  Lipshitz LLP.  The firm represents Mr. Packer in other matters and Mr. Hirsch had a personal
17  relationship with a partner at the firm.
18      At the hearing, the Court noted that Globis appears to have been a net seller and asked
19  counsel to provide the Court with supplemental briefing as to whether defendants would assert
20  at class certification that Globis is not an appropriate class representative.  The defendants and
21  Globis provided the Court with supplemental briefing.  Defendants' position is that Globis,
22  being a net seller, profited from the alleged stock price inflation and therefore is not
23  representative of a typical and adequate plaintiff in this class action.  Globis' position is that it
24  is an adequate and typical lead plaintiff in this class action if one calculates financial loss using
25  a "first-in/first-out" (FIFO) method of accounting.  This issue is addressed in depth below.
26      After the hearing, three of the fives cases were voluntarily dismissed and the Court
27  issued an order consolidating the remaining two actions.  The following two actions were
28

3

consolidated into the present case: *Coil Partners, LLC v. Sipex*, C05-00392 WHA and *Alfred H. Jacobson v. Sipex*, C05-00712 WHA.

**ANALYSIS**

The PSLRA seeks to place a real investor, not a lawyer, in charge of the litigation on behalf of the class. This statutory responsibility now resides in what the PSLRA calls the "lead plaintiff." This representative acts as a fiduciary for all members of the proposed class and must provide fair and adequate representation and management to obtain the largest recovery for the proposed class consistent with good faith and meritorious advocacy.

The PSLRA provides that the Court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of the class members in accordance with this subparagraph." 15 U.S.C. § 78u-4(a)(3)(B)(I). The Act creates a rebuttable presumption that the most adequate plaintiff should be the plaintiff who: (1) has brought the motion for appointment of lead counsel in response to the publication of notice; (2) has the "largest financial interest" in the relief sought by the class; and (3) otherwise satisfies the requirements of FRCP 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc). The above presumption may be rebutted only upon proof that the presumptive lead plaintiff (1) will not fairly and adequately protect the interests of the class or (2) is subject to "unique defenses" that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)–(bb).

The PSLRA does not provide any guidance concerning the method of calculating which plaintiff has the "largest financial interest." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Courts in this district have equated "largest financial interest" with the amount of potential recovery. *See In Re Critical Path, Inc. Sec Litig.*, 156 F. Supp. 2d 1102, 1107–08 (N.D. Cal 2001); *In Re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp.2d 1017, 1030 (N. D. Cal. 1999); *Weisz v. Calpine Corp.*, 2002 WL 32818827, *5 (N.D. Cal 2002). In determining which lead plaintiff has suffered the greatest loss under the PSLRA, the law regulating securities losses must be reviewed in part, a discussion that will presently include the issue of the "first-in/first-out" (FIFO) and "last-in/first-out" (LIFO) methods.

4

1    Under the purchaser-seller rule, only purchasers who actually buy or sellers who
2 actually sell in reliance on fraud may sue. Those who simply refrain from buying or selling,
3 even if in reliance on fraud, may not sue. *Blue Chip Stamps et al. v. Manor Drug Stores*, 421
4 U.S. 723, 731–755 (1975). The class period begins when the market was first defrauded. It
5 ends on the date when the truth was fully revealed or when the misinformation became too stale
6 to matter. Those defrauded in between can sue. Once the full truth comes out, an investor
7 electing to keep the stock and gamble on the future events cannot sue for future losses.
8 Otherwise, securities manipulators would become guarantors of a floor market price — even
9 after their manipulations had run their course. *See, e.g., SEC v. Shapiro*, 494 F.2d 1301, 1309
10 (2nd Cir. 1979).
11    The rule of loss causation, in the typical case, requires that the purchaser prove that
12 when the truth came out, the stock price dropped and did so by reason of the exposure of the
13 fraud rather than by reason of industry-wide down trends or other negative factors.
14 *Dura Pharmaceuticals, Inc., v. Michael Brudo*, ___ U. S. ___, 125 S. Ct. 1627, 1631 (2005).
15 Put another way, it is not enough to show that at the time of the purchase, the misrepresentation
16 had created a so-called "fraud premium," *i.e.*, that had the truth been known at the time of
17 purchase, the market price would have been lower. Rather than focusing on the time of the
18 *purchase*, we must, for damages purposes, focus on the time of the *sale* and determine the
19 extent to which revelation of fraud depressed the price as of the sale date. To be more precise,
20 the key inquiry is to isolate the extent of misrepresentations (originally inducing the purchase)
21 that became known during the time the shares were held and then to determine the contributory
22 and cumulative effect of those revelations on the price as of the date of sale, the date of sale
23 being the date of an actual sale within the class period or, constructively, the end of the class
24 period for all shares held to the end.
25    Suppose a share is purchased for $100 in reliance on an actionable misrepresentation.
26 The entire truth then suddenly comes out. The share price immediately drops $60. The only
27 reason for the plunge is the revelation. The entire $60 is recoverable.
28

5

What happens, however, if the defrauded investor sells before the end of the class period? In the case of a purchaser (within the class period) who sells *before any* of the truth is revealed, of course, recovery might be doubtful. This is because the market has absorbed the misinformation and imposed a fraud premium on both the purchase and sale. Often the fraud premium will be the same in each case, thus cancelling the loss. In the case of a purchaser (within the class period) who sells immediately after a partial revelation of the truth with a resultant plunge in the stock price, the critical inquiry, again, is the extent to which the partial revelation has depressed the price as of the date of the sale. Again, the focus is not on the fraud premium on the day of purchase. The focus must be on the day of sale and on the contribution to the loss due to the partial revelation of fraud.

Turning now to a scenario closer to our immediate case, what happens when an investor already owns some shares going into the class period and/or trades actively within the class period? When an investor already owns shares at the outset of the class period and sells them during the class period, the investor actually profits from the fraud by recovering a fraud premium over and above the true value of the shares. When the same investor already holds shares at the outset of the class period but, in addition, buys and sells shares during the class period, the gains received must be used to reduce the losses incurred. Otherwise, the investor would reap a windfall.

Over the course of the class period, there are two items needed for this calculus. One may be called the "loss-causation contribution." This is the contribution made to the overall loss by revelation of fraud between the dates of the purchase and sale. This item is relevant to recoverable damages as set forth by the Supreme Court. *See Dura Pharm. Inc.,* 125 S. Ct. at 1631–2. The other is the "fraud premium," *i.e.*, the extent to which the price remains inflated due to unrevealed fraud. The second item is relevant to the offsetting of windfall for shares sold during the class period.

The LIFO/FIFO issue arises, among other scenarios, when a trader has an inventory of the shares in question going into the class period and trades during the class period, as here. Suppose one share is owned going into the class period, another share is then bought in reliance

6

on the fraud, one share is then sold midway through the class period and, finally, one share is sold at the end of the class period. Recovery is allowable, of course, only for the share purchased during the class period. But which share was sold when? Under FIFO, the previously-held (non-actionable) share would be the first sold share. The fraud-induced (actionable) share would be the last. Under LIFO, it would be the opposite. In doing the math for the recoverable loss and the offsetting windfall, it would be necessary to determine the fraud premium and loss-causation contribution. Depending on which of the two sales is deemed to be actionable, these calculations will vary.[3]

The FIFO method would dictate that the actionable purchase was sold later. That loss would be offset by a windfall of any fraud premium received on the first sale. The LIFO method would dictate that the actionable purchase was sold first. There would be no windfall on the later sale since, by definition, any fraud premium will always completely be eliminated by the end of the class period. This, plus the fact that the recoverable loss will often be less during the mid-range of the class period explains why defendants prefer the LIFO method and plaintiffs prefer the FIFO, although this preference can be reversed in particular cases.

In the Court's view, LIFO is closer to the economic realities of market investing and the purposes of the securities acts. If a trader buys and sells the same number of shares of the same issue, on the same day, the economic reality of the basic investment decision is a net of one against the other, *i.e.*, no change in position, at least as of the end of the day. Put differently, if a trader buys and sells shares of the same issue over a brief period, the trader is relying on the same basic market analysis and same market information. If a fraudulent misrepresentation has affected the market, it has affected *both* sides of the equation. The LIFO method better tracks the impact of investment decisions and how market fraud impacts them. This is at the core of the securities acts. So, this Court will follow a LIFO convention for investors who both buy and sell within the class period.

---

[3] This Court expresses no opinion on the scenario in which the stock price goes up during the class period in the presence of fraud but where the stock price would have gone up even in absence of the fraud. *See Dura Pharm., Inc.*, 125 S. Ct. at 1632.

This conclusion is in accordance with the weight of authority. *See, e.g., In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996 fn.2 (N. D. Cal. 1999); *In re Network Assoc. Inc. Sec. Litig.*, 76 Supp. 2d 1017, 1027 (N.D. Cal. 1999); *Weisz v. Calpine Corp.*, 2002 WL 32818827, *7 (N.D. Cal 2002); *In re Clearly Canadian Sec. Litig.*, 1999 U.S. Dist. LEXIS 14273, *12–14 (N.D. Cal. 1999); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945 (N.D. Ill. 2001).

At the May 12, 2005 hearing, counsel for Globis relied on an unpublished decision, *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2004 U.S. Dist. LEXIS 27008 (N.D. Cal. 2004), that cites *Broudo v. Dura Pharmaceuticals Inc.*, 339 F.3d 933, 938 (9th Cir. 2003), for the proposition that damages may be proved by simply showing that plaintiffs purchased stock at an inflated price. As discussed, *Broudo* has been subsequently overturned by *Dura Pharmaceuticals, Inc. v. Michael Broudo*, 125 S. Ct. 1627, 1631 (2005). In its supplemental briefing, Globis cited published cases that used FIFO as an accounting methodology for determining financial losses and several unpublished cases. *See e.g. Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 411 (D. Minn 1998); *Vansguard v. Ariba, Inc.*, C-03-00277 JF, slip op. (N.D. Cal. 2003). These cites, however, are not helpful. While the courts accepted the calculation of damages based on FIFO, they did not arrive at the application of FIFO after a reasoned discussion of the merits. It was merely a background fact.

Since Globis, an active trader, was a net *seller* throughout the class period, there is a plausible chance that Globis will have no net recovery. This is not yet certain, however, because the necessary calculations are unknowable at this early stage. Only with the benefit of expert evidence could the necessary items be determined and then netted. For the time being, Globis has a sufficient stake to be appointed as one of two lead plaintiffs. Because the net loss is speculative for Globis at this point and because Globis may eventually be shown to have no net loss, Mr. Hirsch will be made a co-lead plaintiff. This ruling is without prejudice to defense arguments to be made later, on the class certification motion. The same is true for the other Rule 23 issues raised by the defense. (No other competing lead plaintiff is challenging the Rule 23 qualifications of the pending candidates).

8

### RESPONSIBILITIES OF LEAD PLAINTIFF

The lead plaintiffs must take affirmative steps to keep themselves informed at all times of the progress and status of the case, the strengths and weaknesses of the case, the prospects for settlement, and the resources invested in the suit or proposed to be invested. With respect to each major litigation event, such as important motions, settlement discussions, trial, and trial preparation, the lead plaintiffs must actively inform themselves in advance and shall have the authority and responsibility to direct counsel, after, of course, receiving the advice of counsel. The lead plaintiffs must consult with counsel in advance to determine whether major tasks proposed by counsel are likely to add more value to the case than would be incurred in time and expense. The lead plaintiffs shall meet in person with lead trial counsel at least quarterly to review the progress and status of the case, shall attend all major hearings and mediation sessions and shall, at a minimum, attend all sessions of the trial where the jury is present. And, of course, the lead plaintiff must give testimony. No settlement will be approved by the Court without the lead plaintiffs' careful recommendation in favor of it. Reasonable travel, telephone and business expenses incurred as a result of the lead plaintiff duties, if detailed and itemized, may be reimbursed as expenses from any recovery.

Appended to this order are two forms of certification which Mr. Hirsch and Mr. Packer, on behalf of Globis Partners LLP, individually, must sign, file and serve on or before **JUNE 1, 2005**, in order to complete the appointment, obligating themselves to carry out the responsibilities as lead counsel and the procedure for selecting and approving class counsel, a procedure to which this order now turns.

### PROCEDURE FOR SELECTING AND APPROVING CLASS COUNSEL

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. 78u-4(a)(3)(B)(v). Selection and approval of class counsel are important responsibilities for the lead plaintiff and the court. The selection and approval require an assessment of the strengths, weaknesses and experience of counsel as well as the financial burden — in terms of fees and costs — on the class.

*Wenderhold v. Cylink Corp.*, 191 F.R.D. 600, 602–03 (N.D. Cal. 2000); *Network Assocs.*, 76 F. Supp. 2d at 1033–34.

Any important decision made by a fiduciary should be preceded by due diligence. A lead plaintiff is a fiduciary for the investor class. No decision by the lead plaintiff is more important than the selection of class counsel. Consequently, the lead plaintiff should precede his or her choice with due diligence. The extent of such due diligence is a matter of judgment and reasonableness based on the facts and circumstances.

The lead plaintiffs should immediately proceed to perform their due diligence and, through counsel, move for the appointment and approval of their selected counsel no later than **JUNE 17**. The motion should be accompanied by declarations from each lead plaintiff explaining the due diligence undertaken by each with respect to the selection of class counsel. The declarations should also explain why the counsel selected was favored over other potential candidates. The declarations should be filed under seal and not served on defendants. The motion for approval of lead plaintiffs' choice of counsel, however, should be served on defense counsel. No hearing will be held on the motion unless the Court determines that it would be beneficial. Once class counsel is approved, the first order of business will be to file a consolidated complaint. The Court expects this to be done by **JULY 14** and any motion to dismiss to be filed by **AUGUST 11**.

**IT IS SO ORDERED.**

Dated: May 24, 2005.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10