United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SIPEX CORPORATION SECURITIES LITIGATION <br> ──────────────────────────────/ <br> AND CONSOLIDATED CASES <br> ──────────────────────────────/ | No. C 05-00392 WHA <br><br> **ORDER DENYING MOTIONS TO DISMISS (EXCEPT AS TO PHILIP KAGEL)** |

Sipex's own public admission that its financial reports for the period in question should not be relied upon and would be "restated" meant that the as-issued reports were materially inaccurate under GAAP. The company's Form 8K (filed April 19, 2005) conceded that it had improperly recognized revenue for sales in which price protection, stock rotation, and/or return rights and other concessions were granted during the period in question. A year has passed and still no restatement has emerged. These circumstances, however, do not alone raise a strong inference of scienter. Financial reporting errors, even material ones, can result from innocent mistakes or mere negligence.

Sipex, however, has further admitted that its audit committee conducted an internal investigation and recommended certain remedial actions later approved by the board of directors, including:

- Termination of certain employees,
- Restructuring the customer-marketing function to require that all its finance-related activities be performed by the finance department,

    •      Annual ethics training for all employees,

    •      Annual compliance confirmation for all employees,

    •      Certification from the appropriate sales and marketing personnel, and

    •      Staff increases to upgrade the finance function.

This was strong medicine. Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls. These circumstances, combined with the announcement of the impending restatement establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question. This seems even clearer in light of the probability that CEO Walid Maghribi's resignation was forced, coming as it did only days before the commencement of the internal legal and accounting investigation.

The complaint establishes (for purposes of this motion) that CEO Maghribi, during the period in question, personally orchestrated a sham "sale" in the amount of $350,000. This is not a vague allegation. It is described in painful detail in the complaint (¶¶ 49–53). Sham transactions like the one alleged have no place in honest commerce. No CEO in a public company should engineer such phony deals even if they are themselves not material.

Defendants suggest that the sham transaction never hit the books and was never reflected in the published financials. This argument fails at the pleading stage. Many decades of experience teach that sham transactions like the one alleged are not done for the fun of it — they are done to cook the books. At all events, contrary to the defense, the complaint *does* allege that the transaction was recorded and affected the books (¶¶ 51–53). Finally, that Sipex itself has announced that its financials for the period in question were overstated revenue lends distinct credibility to the charge.

Defendants say that $350,000 has not been shown to be "material." For a company of Sipex's size, with reported quarterly revenues of about $17 million, defendants may ultimately be right. A $350,000 revenue item, however, cannot be said to be immaterial as a matter of law at the pleading stage. SEC Staff Accounting Bulletin No. 99 — Materiality, 17 C.F.R. Part 211 (Aug. 12, 1999); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162–63 (2d Cir. 2000).

2

1    Moreover, the sham transaction was material in a wholly different sense: Investors would be
2    interested in knowing that the company CEO, president and director was personally orchestrating
3    the phony sale alleged. This would have raised a red flag for investors that top management was
4    potentially corrupt. This was not disclosed. This alone made the sham transaction material.

5    　　　　As noted, the company has publicly admitted that its financials for the period in question
6    improperly recognized revenue on sales "for which price protection, stock rotation and/or return
7    rights and other concessions were granted" (Form 8-K filed Apr. 19, 2005). The complaint
8    parrots these admissions. It alleges that the company represented that no distributor received any
9    "price protection" (¶¶ 84, 89, 130). The Form 8-K now reveals, however, that this was untrue, as
10   the complaint also alleges (*see*, *e.g.*, ¶ 133). While we cannot glean from the complaint the extent
11   of price protection, Sipex itself has admitted in its Form 8K filings that price protection practices
12   contributed to the overstatement. Combined with the rest of the complaint, this is enough to
13   sustain the allegation that undisclosed price protection contributed to a material overstatement.

14   　　　　As to returned merchandise, CW5 was a former senior manager immediately prior to the
15   class period and was heavily involved in the accounting function. CW5 alleges that CEO
16   Maghribi entered into "side agreements" with "some of the distributors" for returning product at
17   will. Sipex recognized revenue on sales to such distributors but allegedly should not have
18   because of the right of return. On the other hand, Sipex's public statements acknowledged at the
19   time that "limited return rights" existed. CW5 did not explain the extent of any return rights.
20   Return rights are not per se improper. Revenue recognition depends in part on whether the extent
21   of future returns can be reasonably estimated. The complaint does not illuminate this factor.
22   CW5 goes on to say that detailed reports on the returns were provided to the company's auditors
23   on a quarterly basis (¶ 66). That the outside auditors were reviewing the return number
24   (presumably for GAAP compliance) tends to validate the reported figures rather than undermine
25   them. These factors favor the defense. On the other hand, the Form 8-K confirms that "stock
26   rotation for return rights and other concessions" were, in fact, granted. Given this further
27   admission, the Court will sustain this allegation despite its lack of supporting detail.
28

3

1    As to the alleged practice of "pulling in sales" from future quarters, CW3, a former Sipex
2    customer service supervisor, avers that the company had a backlog of orders. The weekly
3    "Backlog Report" allegedly showed each order and when the distributor expected it to be shipped,
4    taking into account the lead time to manufacture. If Sipex could beat the expected date, Sipex
5    would do so, shipping ahead of the expected date. Sometimes distributors accepted the premature
6    shipment. "In many cases, the entire order would be returned to the company because the
7    distributor simply would not accept it" (¶ 56). This would lead to filling out return authorization
8    forms. Sometimes Sipex told the distributor not to return the product but to keep it and not pay
9    for it until the original agreed-upon date (¶ 57).

10   This allegation is a mixed bag. There is nothing wrong per se with sending a backlogged
11   product to a customer ahead of the expected schedule, at least when the customer acquiesced in
12   the original expected delay on account of a backlog and the lead time to manufacture. To
13   overcome the backlog and ship sooner can be good customer service; it avoids unwanted delay
14   for the customer. Even if the customer refuses to pay for early-shipped goods until the "agreed-
15   upon" date, if the obligation to pay is still firm, the sale conceivably can be booked on shipment
16   anyway. On the other hand, if the customer returns the goods as unwanted so early, then the sale
17   must be undone or so the complaint alleges. The problem is that CW3 scrambles the various
18   possibilities into a single souffle. It is too hard to divine how much, even roughly, was improper.
19   The Form 8-K did not acknowledge any problem on this issue. The allegations in the complaint
20   on this point are insufficient.

21   In summary, a strong inference of fraud by CEO Maghribi and the company has been
22   shown with respect to improper revenue recognition during the class period. This is based on the
23   admission by Sipex that the financials were materially misleading, the recent forced resignation of
24   CEO Maghribi, the recent muscular corporate internal reforms including pervasive ethics training
25   and annual certifications, the recent admission that the company's revenue recognition practices
26   had been at fault, and the $350,000 sham sale engineered by CEO Maghribi himself.

27   These circumstances are sufficient to allow this case to survive under the PSLRA. On the
28   other hand, this order holds that the allegation as to one alleged accounting practice (early

4

shipments) is not specific and convincing on this record.  Given that the complaint has largely been sustained, discovery will be allowed into all of the alleged revenue practices.  To try to carve out the issue of early shipments out of discovery would invite interminable discovery disputes.

As to defendant Phillip A. Kagel, the complaint must be dismissed.  He was with the company as its CEO for 14 months (February 2003 through April 2004).  He resigned eight months before CEO Maghribi.  He was not fired by the board (as far as we can tell from the complaint). Nor was he involved in the $350,000 sham sale.  He was not subjected to the ethics re-education and retraining in 2005.  Presumably, he had something to do with the revenue recognition while he was on board but given the lack of detail as to his involvement, a strong inference of fraud is impossible to draw against Mr. Kagel at this stage.  His motion do dismiss is **GRANTED** with leave to amend within fourteen calendar days.  Please do not ask for an extension without very good cause.

**IT IS SO ORDERED.**

Dated:  November 17, 2005.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE